## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SAN FRANCISCO RESIDENCE** | ] | |
| **CLUB, INC.,** *et al.*, | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | **Case Nos.: 2:14-CV-1953-KOB** |
| **v.** | ] | **2:14-CV-1954-KOB** |
| | ] | **2:14-CV-1955-KOB** |
| **LEADER, BULSO & NOLAN,** | ] | |
| **PLC,** *et al.*, | ] | **This Document Relates to All Cases** |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

These three consolidated legal malpractice and unpaid legal fees cases come

before the court on Defendants' motions for summary judgment filed in each case

and Plaintiffs' associated motion to exclude two of Defendants' expert witnesses.

(2:14-cv-1953-KOB, Docs. 205 and 208; 2:14-cv-1954-KOB, Docs. 208, 211, and

214; 2:14-cv-1955-KOB, Docs. 204, 207, and 210).

The Plaintiffs in these cases were all collectively engaged in the activities

that form the basis of the claims in the underlying lawsuits described below during

which the Defendants allegedly committed malpractice. The Plaintiffs are (1) San

Francisco Residence Club, Inc., a California corporation primarily engaged in real

estate business; (2) Thomas O'Shea, a California resident who conducted real

estate business and appears in his individual capacity and as a trustee of the Trust

1

of Thomas O'Shea and Anne Donahue O'Shea; (3) Anne Donahue O'Shea, a California resident who conducted real estate business and appears in her individual capacity and as a trustee of the Trust of Thomas O'Shea and Anne Donahue O'Shea; (4) Kate Larkin Donahue, a California resident who conducted real estate business and appears in her individual capacity; and (5) Grandview Credit, LLC, a California limited liability company primarily engaged in financial business with only one member who is a California resident and not separately a plaintiff in this case.  The Plaintiffs collectively bring the same claims in these cases and mostly refer to themselves as "Plaintiffs" in their complaint and brief in opposition to summary judgment, so, unless differentiation is necessary, the court will refer to the Plaintiffs collectively throughout this memorandum opinion.

The Defendants in these cases are (1) Leader, Bulso & Nolan, PLC, a law firm based in Nashville, Tennessee ("LBN"); and (2) Eugene N. Bulso, Jr., a lawyer and partner of LBN.  Defendants represented Plaintiffs as counsel in the underlying lawsuits described below.  Plaintiffs bring their claims against LBN and Mr. Bulso collectively, alleging that they are jointly and severally liable for all claims.

The Plaintiffs suffered substantial losses from several botched real estate transactions.  They retained Defendants as counsel to recover those losses in at least five underlying lawsuits.  Plaintiffs experienced several setbacks during those

lawsuits and place the blame for their suboptimal results on Defendants' legal representation. Specifically, Plaintiffs allege that Defendants did not timely disclose all of the damages that Plaintiffs would pursue; designated an unqualified expert witness; wrongfully diverted settlement funds; and overbilled Plaintiffs for attorneys' fees and expenses. Plaintiffs assert that each of these acts constitutes a violation of the standard of care that Defendants owed them under the Alabama Legal Services Liability Act ("ALSLA").

Plaintiffs also move to exclude the testimony of two of Defendants' expert witnesses. Defendants anticipate that those experts will testify at trial that Defendants' representation of Plaintiffs never violated the ALSLA standard of care. According to Plaintiffs, those two experts are not qualified to give their opinions, have not used reliable methodology to form their opinions, and will not provide helpful testimony to a jury.

Defendants deny that they violated the ALSLA during the course of their legal representation of Plaintiffs and move for summary judgment on all of Plaintiffs' claims. Specifically, Defendants contend that their late disclosure of all of Plaintiffs' damage claims in an underlying lawsuit did not deprive Plaintiffs of any more favorable result; that Defendants did not violate any standard of care in their choice of an expert witness, a choice that backfired only on a matter of first impression; that Defendants used settlement funds in a manner approved by their

fee agreement with Plaintiffs; and that Defendants never overbilled Plaintiffs.

Also, Defendants bring a counterclaim in each of these three consolidated cases to recover a total of $312,327.25 in legal bills that Plaintiffs have not paid. Defendants move for summary judgment on their counterclaims because they contend that no genuine dispute exists that they billed Plaintiffs only for reasonable and necessary services and expenses.

The court will grant Defendants' motions for summary judgment as to all of Plaintiffs' claims. As explained below, no evidence supports Plaintiffs' "case within a case" that they must show to state an ALSLA claim; *i.e.*, Plaintiffs have failed to show that Defendants' committed actionable fault in the *underlying* lawsuits as required to state a claim in *these* cases. Also, Plaintiffs' claims based on Defendants' choice of expert witness and handling of settlement funds fail because neither of these acts breached any duty owed to Plaintiffs.

And the court will grant in part Defendants' motions for summary judgment on their counterclaims as to Plaintiffs' liability for any damages that a jury may award. But the court will deny in part Defendants' motions for summary judgment on their counterclaims as to the amount of damages for their counterclaims because a genuine dispute exists as to whether Defendants agreed to waive or reduce some of their fees.

The consolidation of these cases, the number of pending motions, the

extensive discovery overseen substantially by a Special Master and meticulously documented on the record, and the nature of Plaintiffs' claims contribute to the somewhat convoluted nature of these actions. To most effectively unravel these cases and to most clearly express the court's findings, this memorandum opinion will proceed in the following sequence: (1) the applicable standard of review for Defendants' motions for summary judgment; (2) background on each of these three consolidated cases individually, further broken down into the facts of the underlying lawsuits during which Defendants' allegedly committed malpractice; (3) analysis of Plaintiffs' motion to exclude two of Defendants' expert witness; (4) review of the law governing legal malpractice claims in Alabama; (5) individual analysis of each of Defendants' motions for summary judgment as to Plaintiffs' ALSLA claims; and (6) analysis of Defendants' counterclaims.

## I.    STANDARD OF REVIEW

A trial court can resolve a claim and/or a counterclaim on summary judgment only when the moving party establishes two essential elements: (1) no genuine disputes of material fact exist; *and* (2) the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Under the first element of the moving party's summary judgment burden, "'[g]enuine disputes [of material fact] are those in which the evidence is such that a reasonable jury *could* return a verdict for the non-movant.'" *Evans v. Books-A-*

*Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (emphasis added) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).  And when considering whether any genuine disputes of material fact exist, the court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Conclusory allegations cannot create genuine issues of material fact.  *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995).  And inferences can defeat summary judgment only if drawn from *facts*.  *Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015).

## II.    BACKGROUND

### A.    The Park Tower Case (the Subject Matter of Case No. 2:14-cv-1953)

#### 1.    *Underlying Facts in the Park Tower Case*

The "Park Tower Case" refers to the case styled as *San Francisco Residence Club, et al. v. Park Tower LLC, et al.*, case no. 5:08-cv-01423-AKK, in which Defendants represented Plaintiffs as counsel.

The Park Tower Case arose out of Plaintiffs' attempt in 2007 to purchase a commercial office building in Huntsville, Alabama known as Park Tower. Plaintiffs invested nearly $6 million in cash and assumed nearly $5 million in debt to purchase the property.  Plaintiffs intended for the transaction to qualify as a like-

kind exchange under Section 1031 of the Internal Revenue Code so they could defer capital gains taxes. But, after the transaction closed, they owned no interest in the Park Tower property and reaped no Section 1031 benefits. Instead, title vested entirely in "Park Tower, LLC," a limited liability company controlled by Plaintiffs' real estate agent and property manager, Scott McDermott, and in which no Plaintiff had any direct interest. (*See* cv-1953, Doc. 207-1 at ¶¶ 14–15).[1]

Plaintiffs sued four groups of defendants for the botched transaction: (1) Scott McDermott and his associates ("the McDermott defendants"); (2) Wilmer & Lee P.A. and one of the firm's attorneys, Sam Givhan, who served as Plaintiffs' closing attorney for the Park Tower transaction ("the W&L defendants"); (3) Coldwell Banker Real Estate LLC, the franchisor of Mr. McDermott's real estate agency; and (4) InterSouth Properties, Inc., an affiliate of Mr. McDermott. (cv-1953, Doc. 207-1 at ¶ 16). Plaintiffs brought their case, styled as *San Francisco Residence Club, et al. v. Park Tower LLC, et al.*, case no. 5:08-cv-01423-AKK, in this court before Judge Abdul Kallon in 2008.

Mr. Bulso and his firm, LBN, represented Plaintiffs as counsel in the Park Tower Case. Over the course of three years, Plaintiffs reached *pro tanto* settlement agreements with each group of defendants one by one. Plaintiffs first reached cash

---

[1] Each citation to a docket entry in this memorandum opinion begins with a reference to which case the court refers: "cv-1953" for case no. 2:14-cv-1953-KOB; "cv-1954" for case no. 2:14-cv-1954-KOB; and "cv-1955" for case no. 2:14-cv-1955-KOB.

settlements with Coldwell Banker and InterSouth. Plaintiffs then reached a *pro tanto* settlement agreement with the McDermott defendants pursuant to which Plaintiffs would acquire total ownership of the Park Tower property in a manner that would render the transaction a Section 1031 like-kind exchange. Judge Kallon entered an order enforcing the settlement agreement with the McDermott defendants on October 7, 2010. (*See* cv-1953, Doc. 207-1 at ¶¶ 17–19).

Then the sequence of events underlying Plaintiffs' allegations of malpractice in the Park Tower Case occurred.

After Judge Kallon's October 7, 2010 order enforcing the settlement agreement with the McDermott defendants, Plaintiffs finally owned Park Tower. But, at that time, Park Tower's investment value was substantially worse than when Plaintiffs paid for the building in 2007. For example, Park Tower had an 80% occupancy rate in 2007 but had only a 30% occupancy rate in 2010. (cv-1953, Doc. 231-42 at 4). Scott McDermott was in charge of managing Park Tower during this three-year period.

Having taken ownership of a building much less valuable than when they paid for it three years earlier, Plaintiffs sought to pursue loss of value damages in the Park Tower Case. And Plaintiffs believed that their closing attorneys in the Park Tower transaction, the W&L defendants—the only remaining defendants in the Park Tower Case after the *pro tanto* settlement agreement with the McDermott

defendants—were complicit with Mr. McDermott in damaging Park Tower's value.

So, on October 11, 2010, Plaintiffs disclosed to the court and the W&L defendants for the first time that Plaintiffs would pursue loss of value damages against the W&L defendants. (cv-1953, Doc. 207-1 at ¶¶ 20–21). LBN disclosed those damages by supplementing Plaintiffs' prior damages disclosure pursuant to Federal Rule of Civil Procedure 26(e), which requires a party to supplement in a timely manner a prior disclosure of the damages he alleges if he attempts to assert a new category of damages. The Rule 26(e) supplement added the loss of value damages to Plaintiffs' claimed damages. (*Id.* at ¶ 21).

The W&L defendants objected to the Rule 26(e) supplement as untimely and prejudicial; the new loss of value category of damages would require the court to reopen discovery and the parties to take additional expert testimony. Judge Kallon agreed. On March 31, 2011, Judge Kallon entered an order striking the loss of value damages from Plaintiffs' Rule 26(e) supplement and precluded Plaintiffs from pursuing those damages as a Rule 37 sanction. (cv-1953, Doc. 207-1 at ¶ 22). Federal Rule of Civil Procedure 37 provides that if a party violates Rule 26(e), then he may not rely on the information he failed to timely disclose "unless the failure was substantially justified or is harmless." Judge Kallon did not find Plaintiffs' failure substantially justified or harmless.

Plaintiffs ultimately settled all claims against the W&L defendants in the Park Tower Case on January 26, 2013. Pursuant to their settlement agreement, Plaintiffs received a cash settlement in a confidential amount from the W&L defendants. (cv-1953, Doc. 207-1 at ¶ 24). The court stayed consideration of a motion to enforce an attorney's lien that remains pending in that case.

### 2. ALSLA Claims in this Case Arising out of the Park Tower Case

In their complaint in case no. 2:14-cv-1953, Plaintiffs allege that Defendants committed the following violations of the ALSLA during the course of their representation of Plaintiffs in the Park Tower Case: (1) Defendants failed to timely disclose that Plaintiffs were asserting loss of value damages, which consequently resulted in a court sanction precluding Plaintiffs from pursuing those damages; and (2) Defendants billed Plaintiffs for unreasonable, unnecessary, or nonexistent services and expenses. (cv-1953, Doc. 1 at ¶¶ 10, 21–29).

The court cannot determine whether Plaintiffs intended for a few other factual allegations in their complaint to serve as independent bases for ALSLA claims. Plaintiffs allege that Defendants (1) "misrepresented the status of the litigation and misrepresented to Plaintiffs that they had claims worth several millions of dollars despite Bulso's superior knowledge of the effect of the sanctions against Bulso"; (2) failed to meaningfully pursue Grandview Credit's claims in the Park Tower Case; and (3) improperly asserted liens on money not

owed to them. (cv-1953, Doc. 1 at ¶¶ 11–14).

But, in any event, those three allegations do not by themselves serve as ALSLA claims. Plaintiffs do not meaningfully rely on those allegations as independent bases for ALSLA claims in their response in opposition to summary judgment. So, to the extent that Plaintiffs intended to state independent ALSLA claims based on those three allegations, Plaintiffs have abandoned those claims. *See Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018) ("The court finds that the Coles abandoned any suppression- or deceit-based fraud theory by failing to advance a relevant argument in response to Owners's motion for summary judgment."). Instead, those three allegations exist only as factual allegations on which Plaintiffs' rely to support their actual ALSLA claims.

### 3. *Counterclaims in this Case Arising out of the Park Tower Case*

Defendants have counterclaimed for $66,540.65 in attorneys' fees and expenses that Plaintiffs allegedly still owe Defendants for services rendered in the Park Tower Case. (*See* cv-1953, Doc. 4 at ¶¶ 8–9). Plaintiffs admit that they did not pay the $66,540.65 but assert that they had no obligation to pay for reasons discussed below. Defendants move for summary judgment on their counterclaim as well as Plaintiffs' claims.

**B.**     **The Moquin Case (the Subject Matter of Case No. 2:14-cv-1954)**

    **1.**     ***Underlying Facts in the Moquin Case***

The "Moquin Case" refers to the case styled as *San Francisco Residence Club, et al. v. Baswell-Guthrie, et al.*, case no. 5:09-cv-00421-CLS, in which Defendants represented Plaintiffs as counsel.

The Moquin Case arose from another botched real estate transaction in 2007 involving the same participants as in the Park Tower transaction.

On January 30, 2007, Plaintiffs paid for two parcels of real property in Huntsville, Alabama known as Moquin and Fountain and another property known as Corporate Drive.  Through their qualified intermediary, WaMu 1031 Exchange, Plaintiffs sent cash to W&L with instructions to close the purchases in Plaintiffs' name as Section 1031 like-kind exchanges.

Plaintiffs alleged that W&L did not follow their instructions.  Instead, similar to what W&L did in the Park Tower transaction, W&L closed the Moquin and Fountain purchases in the name of "Moquin, LLC," an entity in which no Plaintiff had any direct interest, and closed the Corporate Drive purchase in the name of "Corporate Drive, LLC," also an entity in which no Plaintiff had any direct interest.  So, like the Park Tower transaction, Plaintiffs paid for properties that they did not receive and did not reap Section 1031 benefits as intended.

Plaintiffs then sued the same groups of defendants as they did in the Park

Tower Case who essentially performed the same roles in the Moquin transactions as they did in the Park Tower transaction: (1) the McDermott defendants; (2) the W&L defendants; (3) InterSouth; and (4) Coldwell Banker.[2]  Plaintiffs brought their case, styled as *San Francisco Residence Club, et al. v. Baswell-Guthrie, et al.*, case no. 5:09-cv-00421-CLS, in this court before Judge C. Lynwood Smith in 2009.

Mr. Bulso and his law firm, LBN, represented Plaintiffs in the Moquin Case. The case followed a familiar sequence: Plaintiffs settled with InterSouth and Coldwell Banker for confidential cash amounts; Plaintiffs then entered a *pro tanto* settlement agreement with the McDermott defendants pursuant to which the parties would reform the property transactions to qualify as Section 1031 like-kind exchanges in Plaintiffs' name; and then only Plaintiffs' claims against the W&L defendants remained.

Then the sequence of events underlying Plaintiffs' allegations of malpractice in the Moquin Case occurred.

Issues arose with respect to Plaintiffs' claims against the W&L defendants. Because Plaintiffs alleged that W&L committed malpractice by violating Section 1031 of the Internal Revenue Code, Plaintiffs needed a witness to testify as an expert on Section 1031.  So LBN hired Joe Vaulx Crockett, III as an expert witness

---

[2] Plaintiffs also brought suit against an entity known as Baswell-Guthrie and its associates. Those defendants and Plaintiffs' claims against them are not relevant to this case.

with respect to Section 1031. Mr. Crockett was undisputedly a nationally recognized expert in Section 1031 real estate transactions, but Judge Smith still found one issue with Mr. Crockett's qualifications: he was not licensed to practice law in Alabama. (*See* cv-1954, Doc. 213-1 at ¶¶ 9–12).

In a matter of first impression, Judge Smith found that, because Plaintiffs alleged in the Moquin Case that W&L violated the *Alabama* Legal Services Liability Act by failing to comply with Section 1031 of the Internal Revenue Code, Plaintiffs required an expert on the standard of care owed by attorneys to clients under Alabama law, *not* just an expert on Section 1031. *San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 897 F. Supp. 2d 1122, 1192 (N.D. Ala. 2012). Judge Smith found that, in part because Mr. Crockett was not licensed to practice law in Alabama, "[r]egardless of the nature and extent of Crockett's experience with like-kind exchanges and real estate transactions in general, he does not possess the requisite experience or competence to testify on the standard of care expected of real estate attorneys closing property acquisitions in Huntsville, Alabama." *Id.* at 1193. So Judge Smith excluded Mr. Crockett as an expert witness. As a result, Plaintiffs had no evidence to support their malpractice claims against W&L and Judge Smith dismissed those claims.

Like in the Park Tower Case, Plaintiffs eventually settled their remaining claims against W&L in the Moquin Case.

Plaintiffs litigated separate cases arising out of other real estate transactions in other jurisdictions while they pursued the Moquin Case before Judge Smith. Plaintiffs brought suit against several of the same defendants and their associates in federal courts in Hawaii and California and in state court in California. The facts of these so-called "White Sands Cases" and the "Contra County Case" are not pertinent to the present motions for summary judgment; but, importantly, Defendants represented Plaintiffs in those cases while representing Plaintiffs in the Moquin Case. And Defendants applied some of the proceeds obtained from the cash settlement with Coldwell Banker in the Moquin Case to the fees that Plaintiffs owed to Defendants in the White Sands Cases and the Contra County Case.

Defendants asserted that they could apply the funds obtained from the Coldwell Banker settlement agreement in the Moquin Case to legal fees owed in other cases pursuant to a fee agreement they entered into with Plaintiffs on August 5, 2009. (*See* cv-1954, Doc. 213-1 at ¶ 15). Indeed, that agreement provides that the fees owed in the Park Tower Case, the Moquin Case, and the White Sands Cases could be paid out of settlement proceeds obtained in any of those cases. (cv-1954, Doc. 24-4 at 1).

## 2. *ALSLA Claims in this Case Arising out of the Moquin Case*

In their complaint in case no. 2:14-cv-1954, Plaintiffs allege that Defendants committed the following violations of the ALSLA during the course of their

representation of Plaintiffs in the Moquin Case: (1) Defendants failed to designate a suitable expert witness to support Plaintiffs' ALSLA claims—instead, Defendants designated an expert that Judge Smith excluded because the witness was not an expert on the standard of care owed by attorneys in Alabama; (2) Defendants wrongfully diverted funds obtained from the cash settlement with Coldwell Banker; and (3) Defendants billed Plaintiffs for unreasonable, unnecessary, or nonexistent services and expenses. (*See* cv-1954, Doc. 1 at ¶¶ 10–14, 27–34).

### 3. *Counterclaims in this Case Arising out of the Moquin Case*

Defendants have counterclaimed for $147,666.53 in attorneys' fees and expenses that Plaintiffs allegedly still owe Defendants for services rendered in the Moquin Case. (*See* cv-1954, Doc. 4 at ¶¶ 9–10). Plaintiffs admit that they did not pay the $147,666.53 but assert that they did not owe that amount for reasons discussed below. Defendants move for summary judgment on their counterclaim as well as Plaintiffs' claims.

### C. Unpaid Attorneys' Fees in the White Sands Cases (the Subject Matter of Case No. 2:14-cv-1955)

Plaintiffs originally brought only an elder abuse claim in case no. 2:14-cv-1955, but the court dismissed that claim on December 16, 2015 for Plaintiffs' failure to state a plausible claim for relief. Only Defendants' counterclaim for $98,120.07 in unpaid attorneys' fees and expenses in connection with the White

Sands Cases remains in case no. 2:14-cv-1955. (*See* cv-1955, Doc. 26). Plaintiffs admit that they did not pay the $98,120.07 but assert that they did not have to pay it for reasons discussed below.

Having set out the background necessary for the motions presently before the court, the court will analyze Defendants' motions for summary judgment filed in each case. But the court will begin with Plaintiffs' *Daubert* motion to exclude the testimony of two of Defendants' expert witnesses.

## III. ANALYSIS

### A.    Plaintiffs' *Daubert* Motion to Exclude the Expert Testimony of Bruce Rogers and Eugene Bulso

Defendants disclosed Bruce Rogers, Esq. and Eugene Bulso, Jr., Esq. as potential expert witnesses in these cases. Mr. Rogers is a partner of the law firm Bainbridge, Mims, Rogers & Smith, LLP whom Defendants retained "to testify regarding the standards of care that applied to LBN during its representation of Plaintiffs, as well as LBN's compliance with those standards." (cv-1953, Doc. 221-1 at 2). As stated above, Mr. Bulso is a Defendant in this case and a partner of LBN whom Defendants "expect[] to testify that the legal services that he and his firm provided to Plaintiffs complied with the applicable standard of care in all regards." (*Id.* at 3).

Mr. Rogers summarized his opinions in an expert report. (cv-1953, Doc. 221 at 6–38). Because Mr. Bulso is a Defendant not "retained or specially

employed to provide expert testimony in [this] case," Defendants did not have to disclose an expert report from him under Federal Rule of Civil Procedure 26(a)(2)(B). But Plaintiffs still move to exclude Mr. Bulso's testimony based on Defendants' description of his anticipated testimony and Mr. Bulso's endorsement of all of Mr. Rogers's opinions. (*See* cv-1953, Doc. 208 at 21–23).

Plaintiffs move to exclude Mr. Rogers and Mr. Bulso under Federal Rule of Evidence 702 and the *Daubert* framework. Rule 702 governs the admissibility of expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* established rules for a district court's inquiry into the admissibility of expert testimony under Rule 702. 509 U.S. 579 (1993). And the Eleventh Circuit explained that district courts should fulfill their "gatekeeping" function concerning

the admissibility of expert testimony under *Daubert* by evaluating whether the expert testimony meets three requirements: qualification, reliability, and helpfulness. *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016).

First, under the "qualification" prong, the court must determine whether "the expert is qualified to testify competently regarding the matters he intends to address." *Seamon*, 813 F.3d at 988 (quoting *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)) (citing in turn *Daubert*, 509 U.S. at 589). Second, under the "reliability" prong, the court must determine whether the expert's methodology "is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*." *Id.* The "sort of inquiry mandated in *Daubert*" requires evaluating "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 600 (quotation omitted). And finally, under the "helpfulness" prong, the court must decide whether "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Seamon*, 813 F.3d at 988 (quoting *Harcros*, 158 F.3d at 562) (citing in turn *Daubert*, 509 U.S. at 589).

Here, Plaintiffs argue that Mr. Rogers and Mr. Bulso fail all three prongs

under the *Daubert* framework; *i.e.*, that neither person is qualified to testify as an expert, uses reliable methodology, nor would give testimony helpful to a jury.

### 1. *Motion to Exclude Bruce Rogers as an Expert*

Starting with Mr. Rogers, Plaintiffs assert that he lacks qualifications to give the following opinions that Plaintiffs contend are not based on reliable methodology or helpful: (1) that Defendants did not violate the standard of care that an attorney owes to his client by failing to timely disclose the loss of value damages in the Park Tower Case; (2) that Judge Kallon's sanction in the Park Tower Case did not proximately cause any damages to Plaintiffs; (3) that Mr. Bulso did not violate the standard of care by taking the Coldwell Banker settlement funds from his IOLTA account; and (4) that Defendants did not violate the standard of care by designating Mr. Crockett as an expert witness in the Moquin Case.[3] (cv-1953, Doc. 208 at 5–19).

Focusing their arguments on reliability and helpfulness, Plaintiffs do not specifically challenge Mr. Rogers's qualifications to testify as an expert on the standard of care an attorney owes to his client in Alabama. And the court finds that he is qualified in this regard. Mr. Rogers is a partner at the law firm

---

[3] Plaintiffs also moved to exclude Mr. Rogers's opinion that Grandview Credit had no claim for a violation of written escrow instructions and any opinions that Mr. Rogers "did not include in his report and others for [w]hich Mr. Rogers stipulated he was not opining." (cv-1953, Doc. 208 at 19–20). The court will not substantively analyze these challenged opinions in this memorandum opinion because Plaintiffs do not assert any Rule 702 or *Daubert* basis to exclude those opinions and those opinions have no bearing on the present motions for summary judgment.

Bainbridge, Mims, Rogers & Smith, LLP; he has practiced law in Alabama since 1983; indicative of his respect by the Bar, he served as President of the Birmingham Bar Association in 2002 and as Chairperson and member of several Bar Association committees throughout his career; he has litigated at least 99 cases since 2006; he has given CLE presentations or published papers at least 15 times since 1993; he has conducted approximately 300 mediations as a mediator; and he has testified as an expert in four cases.

But Plaintiffs do challenge Mr. Rogers's qualifications to give one opinion. Plaintiffs assert that Mr. Rogers lacks the qualifications to opine that Plaintiffs' claim for loss of value damages in the Park Tower Case would likely have failed because poor market conditions and the 2008 recession damaged Park Tower's value. (cv-1953, Doc. 208 at 12). Plaintiffs contend that Mr. Rogers "is not a real estate expert," "has no specialized knowledge of the effect of the 2007–2008 real estate crash on commercial office buildings in Huntsville, AL," "did not review any data to determine whether the loss of value was caused by the 'great recession,'" and "did not even read Mr. Grelier's expert report on proximate cause and damages." (*Id.*). But none of those facts concern Mr. Rogers's *qualifications* to give the opinions that he *actually* gives, as opposed to Plaintiffs' mischaracterizations of those opinions.

Mr. Rogers actually opines that Defendants did not violate the standard of

care in making the strategic decision to not pursue loss of value damages from the very beginning of the Park Tower Case. (cv-1953, Doc. 221-1 at 12). According to Mr. Rogers, Defendants reasonably anticipated that jurors would infer on their own that the 2008 recession diminished Park Tower's value, so Defendants reasonably decided not to risk their clients' credibility by trying to convince a jury that W&L's actions in fact caused loss of value damages from the outset of the Park Tower Case. (cv-1953, Doc. 209 at 9–10). Mr. Rogers is qualified to give these opinions because, as explained above, he is qualified to testify as to whether Defendants' actions violated the Alabama standard of care. Mr. Rogers does not, as Plaintiffs argue, opine that the recession or the real estate market caused Park Tower's loss of value, so he does not need to be a real estate expert to testify. Instead, his opinion addresses the reasonableness of the attorneys' strategy.

Turning next to the reliability of Mr. Rogers's opinions, Plaintiffs argue throughout their *Daubert* motion that Mr. Rogers has identified no methodology whatsoever that he used to form his opinions on whether Defendants violated the standard of care. But Mr. Rogers's expert report explains his methodology in detail. He explained that he interviewed Mr. Bulso; attended portions of Anne Donahue O'Shea's deposition; analyzed a multitude of documents relating to Defendants' representation of Plaintiffs in the Park Tower Case and the Moquin Case; and then relied on his education, training, and experience as a litigator,

arbitrator, and mediator to form his opinions.  (cv-1953, Doc. 221-1 at 7–12).

Though Mr. Rogers's methods might not be characterized as "scientific" methods as those discussed in *Daubert*, the Supreme Court has held that "some of *Daubert*'s questions can help to evaluate the reliability even of experience-based testimony" like that of Mr. Rogers.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999).  And if the scientific *Daubert* factors—that an expert opinion is capable of being tested, subjected to peer review or publication, given with a known or potential error rate, and accepted by the scientific community—do not logically apply to the expert opinions offered in a case, then the court should consider any other factors that bear on reliability.  *Seamon*, 813 F.3d at 988 (citing *Daubert*, 509 U.S. at 593–95).

Here, the court finds that all of Mr. Rogers's expert opinions on whether Defendants violated the standard of care are sufficiently reliable under *Daubert*. As stated above, Mr. Rogers interviewed Mr. Bulso, attended parts of Ms. O'Shea's deposition, and studied a vast assortment of documents from the Park Tower and Moquin Cases.  Mr. Rogers could not have employed any other reasonable methodology to bring himself up to speed on the entire history of Defendants' representation.  He then applied his specialized knowledge and experience—his 35-year law practice in litigation, hundreds of mediations, several CLE presentations, and experience as an expert witness in past cases—to analyze

Defendants' compliance with the attorney standard of care. In other words, he meticulously analyzed every detail of Defendants' representation and compared their actions to his professional opinion of the standard of care. Thus, the court finds reliable Mr. Rogers's opinions on Defendants' compliance with the standard of care relating to the strategy about the loss of value damages in the Park Tower Case, the expert witness designation in the Moquin Case, and the use of Coldwell Banker settlement funds.

The court also finds reliable Mr. Rogers's opinion on the lack of harm that Defendants caused Plaintiffs in the Park Tower and the Moquin Cases. Mr. Rogers based this opinion on evidence that Judge Kallon's and Judge Smith's orders that precluded Plaintiffs from recovering certain damages in those cases had no impact on Plaintiffs' pending claims for those same damages in the California lawsuits. (cv-1953, Doc. 221-1 at 21). Mr. Rogers cited specifically to an email written by Ms. O'Shea as the evidence for his opinion. (*Id.*) So his opinion is reliable because Plaintiffs and the court can trace the opinion straight to its source and, as he did with his other opinions, Mr. Rogers appropriately applied his specialized knowledge and experience to the evidence.

Finally, the court turns to the last prong of the admissibility of expert testimony: helpfulness. Expert testimony is helpful if it "concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387

F.3d 1244, 1262 (11th Cir. 2004).  In this case, the standard of care that an attorney owes to his client and the effects of court sanctions on damages go beyond the understanding of the average lay person.  So the court finds that Mr. Rogers's opinions would be helpful to a jury.

Having found that Mr. Rogers is qualified to give all of his opinions and that all of his opinions are reliable and helpful, the court will deny Plaintiffs' motion to exclude him as an expert witness.

### 2.  *Motion to Exclude Eugene Bulso, Jr. as an Expert*

Defendants expect Mr. Bulso to testify "that the legal services that he and his firm provided to Plaintiffs complied with the applicable standard of care in all regards," specifically with respect to "[t]he pleading and prosecution of Plaintiffs' available or potentially available damages"; "[c]ommunicating with Plaintiffs regarding the status of the Underlying Lawsuits"; "[i]dentifying, retaining, and disclosing expert witnesses in the Underlying Lawsuits"; "[d]rafting the settlement agreement . . . with the McDermott defendants and others"; and billing.  (cv-1953, Doc. 208 at 3–4).

Plaintiffs raise only a few arguments unique to Mr. Bulso's testimony. Instead, because "Mr. Bulso's opinions mirror Mr. Rogers's opinions," Plaintiffs "incorporate their arguments asserted to preclude Mr. Rogers's opinion testimony" into their arguments to exclude Mr. Bulso's opinion testimony.  (cv-1953, Doc.

208 at 22).  The court has rejected those arguments and thus will deny the motion to exclude Mr. Bulso's opinions that mirror those of Mr. Rogers.  (*See id.* at 21, ¶¶ A–E).

Also, Plaintiffs do not challenge Mr. Bulso's qualifications or the reliability or helpfulness of his *actual* expected testimony.  Instead, Plaintiffs construct a strawman of Mr. Bulso's anticipated expert testimony and then strike it down.

Plaintiffs contend that, besides his opinions that mirror those of Mr. Rogers, Mr. Bulso will opine that (1) Defendants fully communicated with Plaintiffs during the Park Tower Case and the Moquin Case; and (2) that he is not guilty of malpractice.  (cv-1953, Doc. 208 at 22–23).  Plaintiffs move to exclude the first opinion as a question of fact reserved for a jury and move to exclude the second opinion as a legal conclusion that would not help a jury.  (*Id.*).

But those two opinions are not the actual expert opinions that Mr. Bulso intends to give.  Again, Defendants expect Mr. Bulso to testify that "the legal services that he and his firm provided to Plaintiffs complied with the applicable standard of care in all regards."  (cv-1953, Doc. 221-1 at 3).  Plaintiffs have not challenged Mr. Bulso's qualifications to give those opinions or challenged the reliability and helpfulness of those opinions.  So the court will deny their motion to exclude Mr. Bulso's expert testimony.

The court turns next to Defendants' motions for summary judgment on

Plaintiffs' ALSLA claims and begins with a discussion of the law governing those claims.

### B.     The Law Governing Legal Malpractice Claims in Alabama

The Alabama Legal Services Liability Act provides the sole cause of action against a legal service provider in Alabama for the violation of the standard of care applicable to a legal service provider.  Ala. Code §§ 6-5-572(1), 6-5-573.  The ALSLA defines the standard of care owed by a legal service provider as "such reasonable care and skill and diligence as other similarly situated legal service providers in the same general line of practice in the same general area ordinarily have and exercise in a like case."  Ala. Code § 6-5-580(1).

To prevail on a legal malpractice claim under the ALSLA, the plaintiff "must prove the same basic elements as in a negligence action: duty, breach, proximate cause, and damages."  *Pickard v. Turner*, 592 So. 2d 1016, 1019 (Ala. 1992) (citing *Moseley v. Lewis & Brackin*, 533 So. 2d 513, 515 (Ala. 1988)).  The plaintiff must also prove that, "but for the attorney's negligence, the legal matter concerning which the attorney is alleged to have been negligent would have been resolved more favorably to the plaintiff."  *Bonner v. Lyons, Pipes & Cook, P.C.*, 26 So. 3d 1115, 1120 (Ala. 2009).  To meet this burden, the plaintiff must prove two elements: (1) that the plaintiff would have been entitled to a more favorable result but for his attorney's negligence; and (2) that the attorney's negligence in fact

caused the less favorable result.  *Id.*

The first element—that the plaintiff would have achieved a more favorable result but for his attorney's negligence—places upon the plaintiff "the dual burden of proving . . . the underlying claim *and* the instant malpractice claim." *Morrison v. Franklin*, 655 So. 2d 964, 966 (Ala. 1995) (emphasis in original).  In other words, the plaintiff must prove a "case within a case"; *i.e.*, he must prove the merits of the underlying legal issue to demonstrate that his attorney's negligence deprived him of a more favorable result to which he would have been entitled. *Valentine v. Watters*, 896 So. 2d 385, 394 n.5 (Ala. 2004); s*ee Wilborn v. Trant*, 2019 WL 1715642, at *9 (N.D. Ala. Apr. 17, 2019) (explaining the "case within a case" concept underlying an ALSLA claim) (citing *Valentine*, 896 So. 2d at 394 n.5).

The second element—that the attorney's negligence in fact caused the less favorable result—is the "proximate cause" element of an ALSLA claim.  *Pickard*, 592 So. 2d at 1020.  To prove proximate cause, the plaintiff must show "an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred."  *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (citing *Thetford v. City of Clanton*, 605 So. 2d 835, 840 (Ala. 1992)).

An ALSLA claim is subject to the defendant's defense of the "case within a

case"; *i.e.*, "the defendant is entitled to assert defenses that would have been presented in the underlying action." *Valentine*, 896 So. 2d at 394 n.5. The defendant may defeat an ALSLA claim by defending the underlying action with "any and all substantive and procedural defense, restriction, limitation, or immunity which could have the effect of limiting, mitigating, reducing, or avoiding liability or damages" in the underlying action. Ala. Code § 6-5-579(b); *see Valentine*, 896 So. 2d at 394 n.5 (explaining that Ala. Code § 6-5-579(b) "contemplates the 'case within a case' concept").

C. **Plaintiffs' ALSLA Claims in Case No. 2:14-cv-1953 Concerning the Park Tower Case**

Plaintiffs allege that Defendants committed the following violations of the ALSLA during the course of their representation of Plaintiffs in the Park Tower Case: (1) Defendants failed under Rule 26(e) to timely disclose that Plaintiffs were asserting loss of value damages, which consequently precluded Plaintiffs from pursuing those damages; and (2) Defendants overbilled Plaintiffs.

1. *The Untimely Rule 26(e) Supplement*

Plaintiffs first allege malpractice in the Park Tower Case based on Defendants' failure to timely supplement Plaintiffs' Rule 26 damages disclosure in that case. On October 11, 2010, when only the W&L defendants remained as defendants in the Park Tower Case, Plaintiffs asserted that W&L was responsible for Park Tower's depreciation from the time when Plaintiffs paid for it on

September 24, 2007 to the time they gained ownership of the property on October 7, 2010. Plaintiffs had not previously asserted loss of value damages in the Park Tower Case so Judge Kallon struck those damages, which, according to Plaintiffs, precluded them from recovering several million dollars of loss of value damages.

To survive summary judgment on Plaintiffs' claim that Defendants' untimely Rule 26(e) supplement violated the ALSLA, Plaintiffs must show a genuine dispute as to whether they would have fared better in the Park Tower Case but for the untimely supplement. *See Bonner*, 26 So. 3d at 1120. In other words, Plaintiffs must show that if Defendants timely disclosed the loss of value damages, then reasonable jurors could find that Plaintiffs would have been entitled to those damages. But, for the following reasons, Plaintiffs were not entitled to those damages for lack of proximate cause between W&L's conduct and Park Tower's depreciation, so they cannot prove their case within a case to support an ALSLA claim.

Under Alabama law, "[p]roximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." *Martin*, 643 So. 2d at 567 (citing *Thetford*, 605 So. 2d at 840). A "superseding cause" breaks the chain of proximate causation between the defendant and the ultimate injury. *Alabama Power Co. v. Moore*, 899 So. 2d 975, 979 (Ala. 2004).

And a "superseding cause" is an unforeseeable new and independent act that is not a natural and probable result of the defendant's act. *Id.*

But, if an intervening act *is* a natural and probable result of the defendant's act, then the intervening act does *not* break the chain of proximate causation between the defendant's act and the ultimate injury. *Alabama Power*, 899 So. 2d at 979. And the reasonable foreseeability of an intervening act determines whether that act defeats proximate cause. *See id.* ("[T]he line is drawn to terminate the defendant's responsibility for injuries of the *unanticipated* sort resulting from intervening causes which could not reasonably be foreseen, and which are no normal part of the risk created.") (emphasis in original) (quotations and citation omitted).

Ordinarily, a jury must answer whether a reasonable person in the defendant's circumstances would have foreseen the consequences of his act. *Alabama Power*, 899 So. 2d at 979. But, when "the facts of the cause are not conflicting, and where there can be no reasonable difference of opinion as to the conclusion to be reached upon them, those questions are for the decision of the court as a matter of law." *Id.* (quotation and citation omitted). The court can resolve the issue of proximate cause as a matter of law in this case.

W&L closed the Park Tower purchase in the name of Park Tower, LLC, an entity controlled by Mr. McDermott in which no Plaintiff had any direct interest.

Mr. McDermott then mismanaged the Park Tower property for approximately three years. No evidence shows that *W&L* participated in or should have foreseen the mismanagement. So Mr. McDermott's mismanagement was an unforeseeable superseding cause of Park Tower's depreciation that breaks the chain of proximate cause between W&L and Park Tower's loss of value.

Plaintiffs allege that the following chain of events demonstrates that W&L proximately caused Park Tower's depreciation: (1) W&L negligently closed the Park Tower purchase in the name of Park Tower, LLC; (2) closing the purchase in the name of Park Tower, LLC vested Mr. McDermott with control over Park Tower; (3) Mr. McDermott mismanaged Park Tower over the course of three years; and (4) Mr. McDermott's mismanagement caused Park Tower's substantial depreciation. (*See* cv-1953, Doc. 228 at 50–64). The court disagrees.

No genuine dispute exists that no reasonable person should have foreseen that Mr. McDermott would mismanage Park Tower as a consequence of W&L closing the purchase in the name of Park Tower, LLC. Plaintiff Thomas O'Shea testified at his deposition that he chose Mr. McDermott to manage Park Tower after performing due diligence on him and was satisfied with his assurances:

> Well, before I invested in anything, there were some assurances that I needed to have from Scott [McDermott] and from anyone, for that matter. No. 1, that my 1031 would be safe and secure, and my investments would be safe and secure. The properties would be yielding income.

I specifically asked [Mr. McDermott] if he had lawyers, and he assured me he did, Wilmer & Lee.  In fact, he drove me around to Wilmer & Lee's office.  I asked him if he has a management company.  He told me he did.  I asked him if he was a legitimate Coldwell Banker broker.  He assured me he was.

At this point in my life, I was tired of taking care of small investments that I had myself.  I was coming to the age where I—someone told me put out the paint bucket and give your investments to some professionals who will manage it and give you a rate of income on your investments.

And so I inquired as to whether [Mr. McDermott] and his properties would do all that, and he assured me that they would.  And I was happy about that.

(cv-1953, Doc. 207-2 at 8).  Because of Mr. O'Shea's satisfaction with Mr. McDermott as a manager before the Park Tower purchase, W&L could not have foreseen that Mr. McDermott would so haphazardly manage Park Tower.

Defendants' counsel pressed Mr. O'Shea at his deposition on how W&L caused the depreciation of Park Tower.  Mr. O'Shea testified that W&L caused the depreciation because they "gave all our money to Scott McDermott so that he could buy a building in his name, in the name of the LLC."  (cv-1953, Doc. 207-2 at 16).  Defendants' counsel responded, "[o]ther than that, what did Sam Givhan or Wilmer & Lee do that injured the value of the property?"  (*Id.*).  Mr. O'Shea testified, "[w]ell, that—that in itself.  I'm not sure if they did something else or not. . . .  They may have lied and cheated along the way.  I don't know."  (*Id.*).

Mr. O'Shea then described exactly how Park Tower's value diminished, but

he placed the blame entirely on Mr. McDermott: "[Mr. McDermott] was taking the profits out of the building and paying his own bills, legal bills against us, for one. He . . . just gave some offices to his own sister. He was not leasing to anybody. The leasing went—the vacancy rate went way down. The building was worth roughly, I believe, about a half by the time we got it back." (cv-1953, Doc. 207-2 at 22). W&L could not have foreseen such unusual acts of mismanagement.

Plaintiffs also cite to attorney Michael Shiffman's deposition as evidence of proximate cause. (cv-1953, Doc. 228 at 58–59). Mr. Shiffman did not represent Plaintiffs in the underlying lawsuits, but he has represented them in related matters and he consulted with Mr. Bulso about Plaintiffs' desire to sue W&L.

At his deposition, Mr. Shiffman described his opinion of W&L's culpability in the loss of Park Tower's value:

> Sam [Givhan, a W&L attorney,] didn't follow escrow instructions; Sam stole our money; Sam gave our money to Scott McDermott to use as he saw fit; Sam gave control of the property to Scott McDermott; Sam didn't cooperate in trying to fix the mistakes that he made either intentionally or negligently; Sam was the gatekeeper and he opened the gate inappropriately and we were damaged; and we got damaged because Scott was an inexperienced operator; Scott had no money, he couldn't possibly have run that building properly, and he was stealing the money, and it took three-plus years to get control of it and another five to six years to fix it.

(cv-1953, Doc. 231-39 at 1). So, like Mr. O'Shea's deposition, Mr. Shiffman's deposition outlines Plaintiffs' theory of proximate cause: W&L failed to properly close the Park Tower sale; as a result, Mr. McDermott controlled Park Tower; and

then Mr. McDermott mismanaged Park Tower. Again, these events do not show how W&L should have foreseen Mr. McDermott's mismanagement, so Mr. Shiffman's deposition also does not create a genuine issue of proximate cause.

*If* a genuine dispute of proximate cause existed, then the court would expect to find evidence on the record showing that Mr. McDermott had mismanaged Plaintiffs' other properties before the Park Tower purchase or any other conduct that should have put W&L on notice of the risks involved with leaving Mr. McDermott in charge. But no such evidence exists.

So no genuine dispute exists that Plaintiffs were not entitled to recover loss of value damages against W&L in the Park Tower Case for lack of proximate cause between W&L's actions and those damages. Thus, Plaintiffs have failed to show how Defendants' failure to timely raise Plaintiffs' claim for loss of value damages deprived Plaintiffs of a more favorable result to which they would have been entitled. Because Plaintiffs have failed to raise a genuine issue of this necessary element of their ALSLA claim, the court will grant Defendants' motion for summary judgment as to Plaintiffs' ALSLA claim based on the untimely Rule 26 supplement in the Park Tower Case.

## 2. *Overbilling in the Park Tower Case*

In their complaint, Plaintiffs allege that Defendants violated the ALSLA by "excessively overcharging Plaintiffs for deficient legal services, billing for services

not performed, and billing for services that were not necessary." (cv-1953, Doc. 1 at ¶ 27). But, in their brief in opposition to summary judgment, Plaintiffs reframe their overbilling claim as a synonymous affirmative defense to Defendants' counterclaim for unpaid legal fees. (cv-1953, Doc. 228 at 71–72). The court agrees that Plaintiffs' claim for overbilling—that Defendants seek to recover legal fees not owed—is more appropriately pled as an affirmative defense to Defendants' counterclaim. So the court will address Plaintiffs' overbilling arguments when analyzing the motions for summary judgment on Defendants' counterclaims.

## D. Plaintiffs' ALSLA Claims in Case No. 2:14-cv-1954 Concerning the Moquin Case

Plaintiffs allege that Defendants committed the following violations of the ALSLA during the course of their representation of Plaintiffs in the Moquin Case: (1) Defendants failed to designate a suitable expert witness to support Plaintiffs' ALSLA claims—instead, Defendants designated an expert that Judge Smith excluded because the witness was not an expert in the standard of care owed by attorneys in Alabama; (2) Defendants wrongfully diverted funds obtained from the cash settlement with Coldwell Banker; and (3) Defendants overbilled Plaintiffs. The court addresses each claim in turn.

### 1. *The Unsuccessful Designation of Joe Vaulx Crockett, III as*

### *an Expert Witness*

In the Moquin Case, Plaintiffs alleged that W&L committed legal malpractice by failing to close the Moquin transaction in a manner that qualified the purchase as a like-kind exchange under Section 1031 of the Internal Revenue Code for Plaintiffs' benefit. In other words, Plaintiffs asserted that W&L violated the ALSLA by violating Section 1031.

So Defendants decided that Plaintiffs needed expert testimony on Section 1031. Defendants designated Joe Vaulx Crockett, III as Plaintiffs' expert witness. The parties do not dispute that Mr. Crockett was a qualified expert on Section 1031 real estate transactions. But the defendants in the Moquin Case "argue[d] that Crockett's lack of familiarity with Alabama law, or the customs and practices of attorneys practicing real estate law in the Huntsville, Alabama area should preclude him from offering opinion testimony" about the ALSLA standard of care. *Baswell-Guthrie*, 897 F. Supp. 2d at 1192.

Judge Smith took up the issue as a matter of first impression. No court had decided whether an expert only on Section 1031 transactions who was not licensed to practice law in Alabama could testify as to whether an Alabama attorney breached the Alabama standard of care when closing a Section 1031 transaction.

Judge Smith found that Mr. Crockett could not testify as an expert witness and explained his decision as follows:

Crockett's deposition testimony is largely focused on the requirements of Section 1031, and the role of a closing attorney in a transaction intended to be a like-kind exchange. While those issues unquestionably form part of the underlying basis for plaintiffs' claims against [W&L], the *claims under consideration . . . are for violations of the Alabama Legal Services Liability Act.* Any witness who proposes to provide expert opinion testimony in connection with such a claim *must be competent* to testify about that degree of reasonable care, skill, and diligence that similarly situated attorneys providing legal services in the same general line of practice in the same general locality or area ordinarily have and exercise in a similar case. Regardless of the nature and extent of Crockett's experience with like-kind exchanges and real estate transactions in general, he does not possess the requisite experience or competence to testify on the standard of care expected of real estate attorneys closing property acquisitions in Huntsville, Alabama.

*Baswell-Guthrie*, 897 F. Supp. 2d at 1192–93 (emphasis in original). Judge Smith also specifically disqualified Mr. Crockett as an expert because he was not licensed to practice law in Alabama. *Id.* at 1194.

After Judge Smith disqualified Mr. Crockett, Plaintiffs had no expert testimony on the ALSLA standard of care, so Judge Smith entered summary judgment in favor of W&L on Plaintiffs' ALSLA claims. *Baswell-Guthrie*, 897 F. Supp. 2d at 1195.

In this case, Plaintiffs assert that Defendants violated the ALSLA standard of care by designating Mr. Crockett as an expert witness in the Moquin Case because he was not licensed to practice law in Alabama and ultimately disqualified as an expert on the ALSLA standard of care. The court disagrees.

Alabama law does not hold attorneys liable for "error[s] in judgment upon

points of new occurrence, or of nice or doubtful construction." *Herston v. Whitesell*, 348 So. 2d 1054, 1057 (Ala. 1977) (quotation omitted). Here, because Judge Smith disqualified Mr. Crockett on an issue of first impression, Defendants made only an "error in judgment upon [a] point[] of new occurrence" by designating Mr. Crockett as an expert. Thus, they did not commit malpractice.

As stated above, no court had answered the question of whether a legal expert had to be licensed to practice law in Alabama to testify about the ALSLA standard of care before Judge Smith's ruling. The Alabama Supreme Court specifically delayed answering that question in 1988 but never revisited the question. *See Crawford v. Hall*, 531 So. 2d 874, 876 (Ala. 1988) (stating that the question of whether an attorney not admitted to the Alabama State Bar could testify as to the standard of care for Alabama attorneys "will be determined at another time, in another case"). And the parties do not dispute that no precedent existed for Judge Smith's ruling. So Defendants could not have reasonably anticipated that their choice of expert would fail as a matter of law.

Besides the fact that Alabama law does not hold attorneys liable for issues of first impression, Defendants reasonably chose Mr. Crockett as an expert. Plaintiffs based their ALSLA claims against W&L in the Moquin Case on W&L's failure to comply with Section 1031. So, unsurprisingly, Defendants determined that they needed an expert on Section 1031 transactions to testify that W&L failed to

comply with Section 1031. Defendants would then argue that W&L's Section 1031 failures violated the ALSLA standard of care because, according to Defendants, the Section 1031 standard of care applied to all attorneys in all states closing Section 1031 transactions. (*See* cv-1954, Doc. 213-1 at ¶ 12) (Eugene Bulso describing this strategy). Though Judge Smith ultimately decided that the legal requirements of Section 1031 were not synonymous with the ALSLA standard of care, no reasonable juror could find that Defendants' strategic decision constitutes negligence. *See Baswell-Guthrie*, 897 F. Supp. 2d at 1193.

Judge Smith even acknowledged the potential merits of Defendants' rationale for designating Mr. Crockett as an expert. Mr. Crockett testified that "the duties of attorneys in closing a transaction intended to comply with Section 1031 'do not vary by state; rather, the same standard of care applies across the Nation.'" *Baswell-Guthrie*, 897 F. Supp. 2d at 1193. So Defendants argued that "the standard of care imposed . . . by the courts in Alabama . . . is precisely the same as the standard of care in any other state." *Id.* And, though he ultimately rejected Defendants' arguments, Judge Smith admitted that "the standard of care may, or may not, require flawless execution of and strict compliance with Section 1031's legal requirements in order to avoid malpractice liability under the Alabama Legal Services Liability Act." *Id.*

Also, the plain language of the ALSLA supports the reasonableness of

Defendants' decision. The ALSLA defines the standard of care as "reasonable care and skill and diligence as other similarly situated legal service providers in the *same general line of practice* in the *same general area*." Ala. Code § 6-5-580(1) (emphasis added). As an expert in Section 1031 transactions, Mr. Crockett could testify as to attorneys in the "same general line of practice" as W&L. And, because Section 1031 is a federal law that applies equally across the United States, Mr. Crockett arguably practices in the "same general area" as W&L.

Importantly, the ALSLA compares an attorney's services to attorneys "in the same general area," *not* just to attorneys "in Alabama." The "same general area" may or may not expand beyond Alabama in the circumstances of a particular case—of course, Judge Smith found that "the same general area" did not extend past Alabama in the Moquin Case. But because reasonable minds could interpret "the same general area" differently before Judge Smith's ruling, Defendants' reasonably interpreted the term to include the area in which Section 1031 applies equally: the entire country.

The Alabama Supreme Court acknowledged the geographical ambiguity embedded in the Alabama standard of care that predated—but was effectively identical to—the current ALSLA standard of care. Before the Alabama Legislature enacted the ALSLA in 1988, the Alabama Supreme Court defined the Alabama standard of care as legal services exercised with "an ordinary and

reasonable level of skill, knowledge, care, attention, and prudence *common to members of the legal profession in the community*." *Crawford*, 531 So. 2d at 876 (emphasis in original). The Alabama Supreme Court acknowledged—but declined to answer—the question of whether the word "community" could refer to the state, the county, the "local community," or "a national 'community.'" *Id.*

The current ALSLA standard of care, enacted by the Alabama Legislature in 1988 and reviewed by Judge Smith, presents the same ambiguity as the pre-ALSLA standard of care. Like "members of the legal profession in the community," "similarly situated legal service providers in the same general line of practice in the same general area" might refer to a national community, especially in a case where attorneys in Alabama must follow the same requirements as attorneys in any state, like they must do when closing Section 1031 transactions.

Plaintiffs raise another challenge to Defendants' designation of Mr. Crockett: that Defendants had better options available. Plaintiffs assert that Defendants should have disclosed two other available experts on the ALSLA standard of care who, unlike Mr. Crockett, were Alabama attorneys. (*See* cv-1953, Doc. 228 at 33–35).

Defendants hired one of these other experts, Jeff DeArman, to testify in the Park Tower Case. In that case, Mr. DeArman opined that W&L's handling of the Park Tower purchase violated the ALSLA standard of care. (*See* cv-1953, Doc.

231-8 at 1–3).  And Defendants hired the other expert, John F. Lyle, III, to testify in both the Park Tower Case and the Moquin Case as to matters unknown to the court—the only document that establishes Defendants' retention of Mr. Lyle, his engagement letter sent to Mr. Bulso, does not indicate the topics on which Mr. Lyle would testify.  (*See* cv-1953, Doc. 231-30).

The court rejects Plaintiffs' argument regarding Mr. Lyle.  No evidence exists of his qualifications, his expertise on the ALSLA standard of care, or the opinions he would have given in the Moquin Case had he been designated as an expert; so no genuine dispute exists as to whether Defendants were negligent by not designating him.

On the other hand, Plaintiffs' argument regarding Mr. DeArman deserves more attention.   Because of Mr. DeArman's expert report in the Park Tower Case opining that W&L violated the ALSLA standard of care, Mr. DeArman may have passed muster as an expert in the Moquin Case.

But whether Plaintiffs would have ultimately fared better with Mr. DeArman as their expert goes to the "case within a case" element of their ALSLA claim. Plaintiffs need to prove their case within a case "*in addition to* duty, breach, proximate cause, and damages."  *Bonner*, 26 So. 3d at 1122 (emphasis added). And Plaintiffs have not identified any *duty* that Defendants breached by designating Mr. Crockett as an expert even though Mr. DeArman was available.

Plaintiffs have offered no evidence that shows the ALSLA standard of care imposes a duty to choose one expert witness over another even when the chosen witness was a reasonable choice. Plaintiffs' only legal expert witness in this case, Mark Hoffman, offered no opinions on this point; instead, he only opined that Plaintiffs would have succeeded at trial in the Moquin Case if Defendants' designated Mr. DeArman. (cv-1953, Doc. 120-3 at 5, ¶ 10; Doc. 120-4 at 39–40). On the other hand, Defendants' expert on the ALSLA standard of care, Bruce Rogers, opined that Defendants did not breach any standard of care in designating Mr. Crockett as a witness. (cv-1953, Doc. 221-1 at 18–21). So no genuine issue of material fact exists because no evidence shows that Defendants violated the ALSLA standard of care by designating Mr. Crockett as an expert witness instead of Mr. DeArman.

In sum, Defendants reasonably chose Mr. Crockett as an expert witness in the Moquin Case based on his expertise on Section 1031 of the Internal Revenue Code, that statute's equal application to attorneys in all states, and their reasonable interpretation of to whom "similarly situated legal service providers in the same general line of practice in the same general area" refers. Defendants' choice failed only after Judge Smith ruled on a matter of first impression; as stated above, Alabama law does not hold attorneys liable for reasonable decisions that backfire on issues of first impression. *See Herston*, 348 So. 2d at 1057. And no evidence

shows that Defendants breached a duty by choosing Mr. Crockett even though Mr. DeArman was available. So no genuine dispute exists that Defendants did not violate the ALSLA in designating Mr. Crockett as an expert witness in the Moquin Case and the court will enter summary judgment in Defendants' favor on that claim.

### 2. *Applying Settlement Funds Obtained in the Moquin Case to Legal Fees Owed in Other Cases*

Next, Plaintiffs assert that Defendants violated the ALSLA by taking funds obtained from the settlement agreement with Coldwell Banker in the Moquin Case and then applying those funds to fees owed to Defendants for services rendered in other cases. Defendants move for summary judgment on this claim because, according to Defendants, their fee agreement with Plaintiffs allowed Defendants to apply the settlement funds to fees owed in other cases. (*See* cv-1954, Doc. 213-1 at ¶ 15). Indeed, an August 5, 2009 agreement between the parties expressly provides that the fees owed in the Park Tower Case, the Moquin Case, and the White Sands Cases could be paid out of settlement proceeds obtained in any of those cases. (cv-1954, Doc. 24-4 at 1).

But Plaintiffs assert that the parties modified their fee agreement after August 5, 2009 in a manner that prohibited Defendants from handling the Coldwell Banker settlement funds in the way that they did. (cv-1953, Doc. 228 at 32–33). But, fatal to Plaintiffs' argument, they have no evidence to support it.

Plaintiffs give a shotgun citation to several materials on the record that purportedly support their contention that the parties modified their fee agreement. (*See* cv-1953, Doc. 228 at 32, ¶¶ 9, 9(a)) (*see also* cv-1953, Doc. 228 at 78–79). But none of those materials—Kevin Donahue's deposition, Anne O'Shea's deposition, Kate Donahue's deposition, and email correspondence between Eugene Bulso and Kate Donahue—mention any modification to the parties' fee agreement whatsoever. And no evidence of a fee agreement modification exists elsewhere on the record. So no genuine dispute exists that the parties contractually agreed that Defendants could apply the Coldwell Banker settlement funds to legal fees owed by Plaintiffs in other cases. Thus, the court will enter summary judgment in favor of Defendants on Plaintiffs' ALSLA claims based on the use of the Coldwell Banker settlement funds.

### 3. *Overbilling in the Moquin Case*

As they allege Defendants did in the Park Tower Case, Plaintiffs allege that Defendants "excessively overcharg[ed] Plaintiffs for deficient legal services, bill[ed] for services not performed and bill[ed] for services that were not necessary" in the Moquin Case. (cv-1954, Doc. 1 at ¶ 33). As the court explained above when analyzing Plaintiffs' overbilling claim in case no. 2:14-cv-1953, Plaintiffs reframe their overbilling claim as an affirmative defense to Defendants' counterclaim for unpaid legal fees. (*See* cv-1953, Doc. 228 at 71–72). So the

court will address Plaintiffs' overbilling arguments when analyzing the motions for summary judgment on Defendants' counterclaims.

### E.    <u>Defendants' Counterclaims</u>

In each of these three cases, Defendants have counterclaimed for attorneys' fees and expenses that Plaintiffs allegedly owe Defendants pursuant to the January 28, 2009 engagement letter setting out the parties' fees and expenses agreement. In case no. 2:14-cv-1953, Defendants seek $66,540.65 for fees and expenses in the Park Tower Case.  (cv-1953, Doc. 4 at 12).  In case no. 2:14-cv-1954, Defendants seek $147,666.53 for fees and expenses in the Moquin Case.  (cv-1954, Doc. 4 at 13–14).  And in case no. 2:14-cv-1955, Defendants seek $98,120.07 for fees and expenses in the White Sands Cases.  (cv-1955, Doc. 4 at 11).  Plaintiffs admit that they have not paid those bills.  For the following reasons, the court will grant in part Defendants' motions for summary judgment as to Plaintiffs' *liability* for unpaid attorneys' fees, but deny in part Defendants' motions for summary judgment as to the exact *amount* of the fees to which Defendants are entitled.

In each case, Defendants attached to their motion for summary judgment a declaration from Eugene Bulso that, according to Defendants, constitutes "competent evidence that legal fees and expenses billed in the [Park Tower Case, the Moquin Case, and the White Sands Cases] were reasonably and necessarily incurred in the representation of the Plaintiffs" and "competent proof that Plaintiffs

have failed to pay [the claimed amounts] of those fees and expenses." (cv-1953, Doc. 206 at 32; cv-1954, Doc. 212 at 27; cv-1955, Doc. 208 at 32).

Mr. Bulso's declaration identifies the principal that Plaintiffs owe LBN in each case; states that the amounts "were reasonably and necessarily incurred in the representation of Plaintiffs"; states when the amounts became past due; and calculates the interest owed on the principal at a 6% simple interest rate per annum. (cv-1953, Doc. 207-1 at ¶ 28; cv-1954, Doc. 213-1 at ¶ 20; cv-1955, Doc. 209-1 at ¶ 28).

In opposition to Defendants' counterclaims and synonymously in support for Plaintiffs' overbilling claims, Plaintiffs raise several unavailing arguments and have offered no expert testimony to challenge the reasonableness of Defendants' fees and expenses or the fact that Defendants are entitled to any of their claimed fees that they did not concede.

First, Plaintiffs contend that Mr. Bulso is biased so the court should not rely on his declaration as evidence of unpaid attorneys' fees. (cv-1953, Doc. 228 at 79). The court disagrees. Mr. Bulso's partnership of the law firm to which Plaintiffs owe fees does not by itself constitute evidence of bias that, as a matter of law, would defeat his competence to testify about unpaid attorneys' fees. Instead, the question of Mr. Bulso's bias presents a credibility issue for a jury on the question of the amount of fees to which Defendants are entitled. *See Adams v.*

*Lab. Corp. of Am.*, 760 F.3d 1322, 1332 (11th Cir. 2014) ("Bias in an expert witness's testimony is usually a credibility issue for the jury.").

Next, Plaintiffs contend that, as a matter of law, a jury must determine whether Defendants fees are reasonable. (cv-1953, Doc. 228 at 79). Plaintiffs are incorrect. The reasonableness of Defendants' fees *would* be a jury question *if* Plaintiffs offered expert testimony to create a genuine dispute as to the reasonableness of those fees. Plaintiffs have not done so.

And Plaintiffs rely only on an inapposite case from the District of Connecticut, *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 125 (D. Conn. 2010), for their mistaken proposition of law that the question of reasonableness in this case must necessarily go to a jury. (*See* cv-1953, Doc. 228 at 79–80). *Master-Halco* is not a legal malpractice case or even a dispute over attorneys' fees; instead, that case involved a plaintiff-manufacturer who brought fraud claims against its accounting firm for allegedly falsifying financial statements. 739 F. Supp. 2d at 127. The plaintiff sought as compensatory damages from its accounting firm the litigation costs the plaintiff incurred from pursuing lawsuits against third parties as a result of the financial statements. The District of Connecticut held that the jury would have to resolve the genuine dispute over the reasonableness of the legal expenses the plaintiff incurred when calculating compensatory damages. *Id.* at 135. No other part of *Master-Helco* is

even tangentially relevant to the issue that Plaintiffs face regarding Defendants' counterclaims: that Plaintiffs have not offered expert testimony to create a genuine dispute over the reasonableness of Defendants' attorneys' fees.

Then Plaintiffs assert that they do not have to pay their outstanding bills because Defendants provided negligent representation. (*See* cv-1953, Doc. 228 at 81). But, for the several reasons discussed above, the court has found that Defendants did not provide negligent legal representation.

Plaintiffs also assert that they "are entitled to offset the fees they paid to hire replacement counsel in each of the matters after Mr. Bulso quit." (cv-1953, Doc. 228 at 82). But they offer no evidence or law to support this proposition and the fees they paid to their replacement counsel has no bearing on the reasonableness of Defendants' fees. And no statement exists from Plaintiffs' replacement counsel that Plaintiffs incurred any consequential costs for having to correct any of Defendants' alleged errors.

So the court finds that no genuine dispute of material fact exists that Plaintiffs are liable for unpaid attorneys' fees and expenses owed to Defendants.

But a genuine dispute of material fact does exist as to the *amount* of fees and expenses that Plaintiffs must pay Defendants. One piece of evidence on the record suggests that Defendants might not be entitled to *all* of their claimed fees. John Donahue testified at his deposition that Mr. Bulso called Mr. Donahue in May

2011 to tell him that LBN could no longer represent Plaintiffs. (cv-1953, Doc. 231-32 at 1–2). According to Mr. Donahue, Mr. Bulso said on the phone call that he would waive or reduce the fees still owed to him and his firm. (*Id.*). If Mr. Bulso agreed to waive or reduce his fees, then Defendants might not be entitled to all of their fees, so Mr. Donahue's deposition testimony raises a genuine issue of material fact as to the amount of fees owed to Defendants.

Mr. Donahue's deposition testimony raises evidentiary issues that the court will resolve in Plaintiffs' favor. Defendants argue that Mr. Donahue's testimony is inadmissible parol evidence. (cv-1953, Doc. 237 at 15). Defendants do not explain *why* the testimony is inadmissible parol evidence and instead only cite an Alabama Supreme Court case that describes generally the parol evidence rule: *Marriott Int'l, Inc. v. deCelle*, 722 So. 2d 760, 762 (Ala. 1998)). But presumably Defendants argue that Mr. Donahue's testimony is inadmissible parol evidence because Defendants believe that Mr. Bulso's purported oral agreement to waive or reduce his fees would contradict the terms of the parties' written fee agreement.

Also, Mr. Donahue's description of what Mr. Bulso said on the phone is hearsay. *See* Fed. R. Evid. 801 (defining hearsay as an out-of-court statement that a party offers in evidence to prove the truth of the matter asserted in the statement).

But a non-moving party can defeat summary judgment with materials that may not be admissible at trial or may be reduced to admissible form. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324, 327 (1986). Here, Plaintiffs could overcome a hearsay objection at trial by calling Mr. Bulso as a witness. And Plaintiffs, who have not had an opportunity to respond to Defendants' parol evidence argument, might overcome a parol evidence objection at trial by showing that Mr. Bulso's alleged statements do not fall under Alabama's definition of inadmissible parol evidence. *See Alabama Elec. Co-op., Inc. v. Bailey's Const. Co.*, 950 So. 2d 280, 287 (Ala. 2006) ("The [parol evidence] rule provides, generally, that when the parties reduce a contract to writing, intended to be a complete contract regarding the subject covered by that contract, no extrinsic evidence of prior or contemporaneous agreements will be admissible to change, alter or contradict such writing.") (quotation omitted). Indeed, Mr. Bulso's purported statements do not appear to be an agreement made "prior or contemporaneous" to the parties' written fee agreement, but a subsequent concession as to the amount of fees owed.

Perhaps Defendants consider Mr. Bulso's purported statements to be inadmissible parol evidence for some other reason, but they have not disclosed any such argument to the court. And, again, Plaintiffs have not had an opportunity to respond to Defendants' parol evidence arguments, whatever those arguments may be. So, despite the potential inadmissibly of Mr. Bulso's purported statements at trial, the court has properly considered Mr. Donahue's testimony to be capable of creating a genuine issue of material fact as to the amounts owed to Defendants

sufficient to defeat summary judgment.

Having found a genuine issue of material fact as to whether Defendants are entitled to *all* of the fees for which they have counterclaimed, the court will deny in part Defendants' motions for summary judgment on their counterclaims *only* as to the amounts of damages for Defendants' counterclaims. But because no genuine dispute exists that Plaintiffs are in fact liable for any unpaid attorneys' fees that a jury finds not conceded by Defendants, the court will grant in part Defendants' motions for summary judgment as to Plaintiffs' liability for the counterclaims.

## IV.   CONCLUSION

For the reasons stated above, by separate order, the court will **GRANT** Defendants' motions for summary judgment as to Plaintiffs' claims and will **DISMISS WITH PREJUDICE** all of Plaintiffs' claims remaining in these cases. But the court will **GRANT IN PART** and **DENY IN PART** Defendants' motions for summary judgment on their counterclaims. Specifically, the court will grant Defendants' motions for summary judgment as to Plaintiffs' liability for Defendants' counterclaims, but will deny Defendants' motions for summary judgment as to the amount of damages for their counterclaims.

**DONE** and **ORDERED** this 20th day of December, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE